**Exhibit A:**

**DECLARATION OF AARON CAPITEL IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

I, Aaron Capitel, Special Agent with the Federal Bureau of Investigation ("FBI"), do hereby declare:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since 2021. I am currently assigned to the FBI's Baltimore Field Office where I conduct complex white-collar crime investigations in Maryland. I have duties that include investigations of, among other matters, mail fraud, wire fraud, health care fraud, and money laundering. I have assisted and participated in the preparation and execution of numerous search and arrest warrants, including electronic account search warrants. I have completed cyber-enabled-crime in-service training courses. During these courses, I received training concerning the use of computers, IP addresses, and servers, among other things to commit cyber enabled fraud. Through my training and experience, I have become familiar with the methods and techniques used by criminals to commit economic crimes, such as wire fraud and money laundering, and how those criminals conceal and store information derived from such criminal activity.

**PURPOSE OF THIS DECLARATION**

2. This Declaration is submitted in support of the Verified Complaint for Forfeiture *In Rem* of the USDT tokens associated with the virtual currency address **"TL6oeK6UkABJmFe5VbjxZSVhc9orPfXfsZ"**, herein referred to as the "**SUBJECT PROPERTY**".

3. I submit that there are sufficient facts to support a reasonable belief that the Subject Property constitutes proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud) and are

involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering) and thus is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

## INVESTIGATION OF THE SUBJECT PROPERTY

### Background on Relevant Cryptocurrency Entities and Concepts

#### Cryptocurrencies and Transaction Analysis

4. Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet. The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

5. Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a

particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

6. Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

7. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience with cryptocurrency, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I also know that when information is shared, it is usually among a trusted group working in concert. In addition, the work of one individual using multiple identifiers can give the false appearance that information has been shared.

8. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience with cryptocurrency, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts. However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters may attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained outside of the United States.

9. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency

to another, in order to attempt to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

Tether

10. **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

11. **Tether (USDT):** Tether Limited ("Tether") is a company that manages the "smart contracts" and the "treasury" (*i.e.*, the funds held in reserve) for USDT tokens (a stablecoin). In this case, the **SUBJECT PROPERTY** was seized via a seizure warrant signed by the Honorable Ajmel A. Quereshi, United States Magistrate Judge in the District of Maryland on January 24, 2025.

**The Investigation**

12. The FBI is investigating what is known as a cryptocurrency "tech fraud scam" with multiple victims located throughout the United States. "Tech fraud" scams take a variety of forms, but generally involve complaints from victims that state they received an email or a "pop up" message on their home computer that indicates their device has been "hacked". The "pop up" message often is accompanied by a frozen screen and provides a notice to call "Microsoft",

"Apple", or another widely known computer software company to resolve the issue. Common examples of the "pop up" messages received by victims resemble the following:







13. Once victims contact "Microsoft" or "Apple" to rectify the "hack", they are passed through a series of imposters who purport to be affiliated with the aforementioned software companies, government institutions, and law enforcement entities. The imposters convince victims that not only are their home computing devices compromised, but their identities and personal information have also been stolen. The fraudsters then convince victims that they must move their assets out of their current financial institutions to other financial accounts to "safeguard" their funds. The victims are led to believe that the accounts they are instructed to send funds to are set up by the United States government and will be protected. In reality, the accounts to which victims are directed to send the funds are controlled by co-conspirators involved in the fraud scheme and are often located overseas. Victims are also often directed to withdraw large sums of money from their financial institutions and open virtual currency accounts to send the funds to cryptocurrency wallets controlled by co-conspirators. Once again, victims are led to believe that the virtual wallets

they are directed to send money to will be used to "safeguard" their funds, but in reality are controlled by co-conspirators.

14. In November 2022, the FBI received a complaint from a victim of a "tech-fraud" scam residing in Silver Spring, MD (herein referred to as "Victim 1"). According to Victim 1, Victim 1 received an email in or about October 2022 that stated her Apple account had been hacked. Victim 1 called the number on the message and spoke to an unknown female ("UF") on the phone. The UF asked Victim 1 to install an application on her iPad named "any desk." Victim 1 was unable to understand what the UF was asking her to do and the call was ultimately dropped. Victim 1 called the "Apple support" number back and was connected with an individual who identified himself as "SAMMY BRAXTON". BRAXTON provided Victim 1 with his identification number and asked Victim 1 to install the AnyDesk application on her iPad. BRAXTON also asked Victim 1 for the phone number on the back of her credit union debit card so that he could call the credit union and advise them of the fraud. Victim 1 provided BRAXTON with the phone number. BRAXTON then passed Victim 1 to an individual Victim 1 presumed to be with the fraud unit of her credit union. The "credit union employee" identified himself as "DANIEL CARMEN". CARMEN also provided Victim 1 with his badge number.

15. CARMEN informed Victim 1 that he saw transactions in her checking account that appeared suspicious, some of which may have been from "poker.com", and told Victim 1 that her Social Security number ("SSN") had been compromised. CARMEN then purported to contact the Social Security Administration ("SSA") and the Federal Deposit Insurance Corporation ("FDIC") on Victim 1's behalf. CARMEN also informed Victim 1 that her bank account was infected by a virus.

16. After speaking with CARMEN, Victim 1 received a phone call from an individual who identified himself as "WAYNE HAGER" from the SSA. HAGER informed Victim 1 that CARMEN contacted the SSA to report Victim 1's SSN had been compromised. HAGER also told Victim 1 that he had reviewed her information and saw that other individuals had opened accounts and credit cards in her name. In a separate conversation with CARMEN, CARMEN stated that he would start an investigation to find the hacker and would put a trace on Victim 1's SSN, wifi network, and phone. Victim 1's information would purportedly be monitored and all of the information CARMEN collected would be shared with the FBI. HAGER told Victim 1 to keep the investigation private because the hacker's identity was unknown and the hacker could be anyone, including Victim 1's friends or family.

17. CARMEN told Victim 1 that she needed to move funds in her financial accounts to keep the funds secure and advised Victim 1 that the FDIC set up personal accounts for Victim 1 in Hong Kong to secure the funds. Victim 1 received a letter purported to be from the FDIC dated August 17, 2022. The letter contained multiple formatting and grammatical errors and requested that Victim 1 contact CARMEN to guide Victim 1 through the process of safeguarding her funds. A screenshot of the letter purported to be issued by the FDIC is as follows:

FDIC
FEDERAL DEPOSIT INSURANCE CORPORATION

550 17th Street NW,
Washington,
DC, 20429.
Date: 08/17/2022

To,

[redacted]

We have received an email from Bank-Fund Staff FCU about getting hacked of your financial institutions. After going through email we have come to the conclusion that you need to safeguard all of your funds which are in your Bank-Fund Staff FCU and other financial institutions. FDIC will be providing an insurance of $2,000,000.00 for all of your funds.

Bank-Fund Staff FCU Fraud prevention department representative Daniel Carmen is going to help you safeguarding your funds.

You can contact Daniel Carmen at 202-945-0820. He will be guiding you to safeguard your funds.

Regards,
FDIC
(Fraud Prevention)

(Figure 1)

18. On February 17, 2023, your Declarant contacted a Special Agent from the FDIC's Office of Inspector General in reference to the above letter. Your Declarant learned that nobody by the name of "DANIEL CARMEN" or "PAUL WINSLEY" (as listed in the signature line of the letter) was listed in the FDIC agency directory.

19. Victim 1 sent several wire transfers to accounts in Hong Kong at the direction of the above scammers. One specific wire was sent on September 20, 2022, in the amount of $210,000 to account number 242845600888 in the name of "CHAN YIP TIN BENNY" located at Hang Seng Bank Limited in Hong Kong. When Victim 1 went to the credit union to withdraw or transfer funds, employees at the credit union asked Victim 1 if she knew the individuals to whom

she was sending the funds and what her relationship was with those individuals. CARMEN directed Victim 1 to tell the credit union employees that she was sending money to her brother-in-law who was losing his business due to COVID.

20. In addition to sending wire transfers, Victim 1 deposited funds into cryptocurrency ATMs at the direction of CARMEN. CARMEN sent QR codes to Victim 1 to use for the transactions at the ATMs.[1] Victim 1 maintained receipts of the deposits she made into the cryptocurrency ATMs.

21. As a result of CARMEN's requests for money, Victim 1 sent a total of 3.29 bitcoin (BTC)[2] over a total of nine transactions in October 2022 via cryptocurrency ATMs. The U.S. dollar value of the 3.29 BTC Victim 1 sent at the time of the transactions was approximately $76,800.

22. Further, Victim 1 transferred approximately $2,100,000 to bank accounts located in Hong Kong as a result of the fraud.

23. Throughout the course of the investigation, the FBI has located additional victims who appear to have been defrauded by the same group of perpetrators directing the "tech-fraud" scam that was responsible for defrauding Victim 1. On August 7, 2024, Victim 2, who resided in Pfafftown, North Carolina, traveled to the FBI Greensboro Resident Agency to report that she was a victim of a "tech fraud" scam. According to Victim 2, on or about March 12, 2024, Victim 2's computer locked itself with a warning that her computer was being hacked and not to turn it off. A pop-up appeared on her computer screen that directed Victim 2 to "call Microsoft Security at 888-586-8075." Victim 2 called the number and spoke with a person who identified himself as

---

[1] Customers can scan QR codes when conducting transactions at cryptocurrency ATMs to provide the addresses where virtual currency will be sent in the transactions.

[2] Unless indicated otherwise, all virtual currency amounts in this affidavit have been rounded to the nearest 0.01.

"RONALD BENSON". BENSON took over Victim 2's computer and scanned it for threats. BENSON told Victim 2 that her IP address was used without her consent to access explicit websites and that her computer contained an identity theft virus. BENSON told Victim 2 that her computer visited the website www.pornhub.com and downloaded child pornography, as well as visited www.poker.com (the same website reported by Victim 1) and conducted illegal transactions. BENSON further stated that Victim 2's computer was compromised with unauthorized login activity, her email was breached, her Social Security number was used inappropriately, and all of her passwords were leaked.

24. Subsequently, Victim 2 received a letter purportedly from the SSA. The letter stated that an advisor from Truliant Federal Credit ("TFC"), Victim 2's personal bank, would provide her with information regarding the investigation. "EMILY JONES" was identified as Victim 2's advisor. The letter also stated that the SSA investigating officer was "WAYNE HAGER", the same name provided to Victim 1. Victim 2 spoke with both JONES and HAGER. Victim 2's experience with HAGER mirrored Victim 1's: HAGER told Victim 2 that he would inform the FBI about the matter, but that she should not discuss the matter with anyone, not even family or friends. Victim 2 was also told that she needed to wait until the hacker was arrested and established a code word, "Sunday", for her to use when speaking with them.

25. The next day on March 13, 2024, HAGER called Victim 2 and stated that an individual had been arrested who had used Victim 2's identity to rent a house in Yuma, AZ. HAGER informed Victim 2 that this person had also opened seven credit cards and three bank accounts in her name. Victim 2 also received a letter purportedly from TFC warning Victim 2 that a pre-authorized withdrawal of approximately $45,744 from her account was sent to www.pornhub.com. JONES told Victim 2 that TFC would create a replica account for her that

would protect her identity and wire funds to the hackers. Once the hackers collected the funds, they would be arrested and the funds would be confiscated. Like Victim 1, Victim 2 received a letter purportedly from the FDIC urging her to wire funds to the replica account to prevent unauthorized access to her funds.

26. On or about March 19, 2024, Victim 2 was directed to visit a nearby TFC and wire $45,744 to the new replica account to safeguard the funds, which was sent to Hoang Dinh Chuyen in Hanoi, Vietnam. Victim 2 was told that she would be reimbursed via a cashier's check. On or about March 21, 2024, Victim 2 was directed to send a second wire in the amount of $24,170.00 to the same account in the name of Hoang Dinh Chuyen. A few days later, Victim 2 received an email image of a Bank of America cashier's check for $78,163 to reimburse her (plus fees) for her wire transfers from JONES, but was told to refrain from depositing the check for 48 hours so as to not alert the hackers. When Victim 2 requested a paper check that she could direct deposit, JONES told Victim 2 that she could scan the Bank of American check with her camera to deposit the check, but only when the investigation was finished.

27. On or about April 26, 2024, Victim 2 was contacted by an individual who identified herself as Senior Officer "JENNA WILSON" of the Texas Department of Justice. WILSON stated that a package containing illegal drugs, thousands of dollars in cash, and two fake driver's licenses in Victim 2's name sent from Mexico bound for El Paso, Texas had been intercepted. WILSON also told Victim 2 that law enforcement conducted a search of the location to which the package was addressed, at which law enforcement found evidence of multiple bank accounts created in Victim 2's name. WILSON informed Victim 2 that she was wanted for money laundering and drug trafficking and had two options: surrender to the authorities, or participate in an alternative dispute resolution ("ADR") process. Victim 2 then began speaking

with an individual who identified herself as "SUSAN PAMERLEAU" from the North Carolina Department of Treasury who worked on ADR cases. PAMERLEAU told Victim 2 that she would put the government arrest warrant for Victim 2 on hold, but that Victim 2 had to prove the money she had was legally hers. To do so, Victim 2 had to withdraw cash and deposit the funds into virtual currency ATMs that would record the individual serial numbers of the bills. At the end of the week, PAMERLEAU told Victim 2 that uniformed agents would come to her home, retrieve the ATM receipts, and return her funds. As a result, Victim 2 withdrew cash from her TFC account on multiple occasions and deposited the funds into virtual currency ATMs. Eventually, Victim 2 spoke with an employee at TFC and discovered she had been scammed.

28. In total, Victim 2 sent approximately $69,914 in wire transfer and $64,700 in virtual currency as a result of the fraud. Funds deposited by Victim 2 into the cryptocurrency ATMs were converted to bitcoin and sent to a single address (**Address 1** as defined in the table below) that was not under the control of Victim 2. A small amount of that bitcoin was traced to the **SUBJECT PROPERTY** as shown in the following table using a commercially available proprietary software tool that analyzes transactions on cryptocurrency blockchains.

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 04/29/2024 | 0.30 BTC | Victim 2 ATM Deposit | 366LkrogbHXUQrMNFvwAJ4vkmJq69dbB3w **("Address 1")** |
| 05/02/2024 | 0.03 BTC | **Address 1** | bc1qwrnazpu847d662swyvugd04dqkdkpeuqmvhu7r **("Address 2")** |
| 10/17/2024 | 0.01 BTC[3] | **Address 2** | 15T4kWubTGhwMkRRyM4KKcGpiQMAARFq8y[4] **("Binance Account 1")** |

[3] This 0.01 BTC was included in a larger transfer of 1.30 BTC from **Address 2** to **Binance Account 1** along with funds from other sources.

[4] Records obtained from Binance showed that the address 15T4kWubTGhwMkRRyM4KKcGpiQMAARFq8y was part of the Binance account of an individual from India. The 1.30 BTC deposit to this individual's Binance account

| | | | |
|---|---|---|---|
| 10/17/2024 | 88,726.82 USDT | **Binance Account 1** | **SUBJECT PROPERTY** |

29. After law enforcement determined the **SUBJECT PROPERTY** held illicit proceeds, a cryptocurrency tracing analysis was conducted using a commercially available proprietary software tool to identify the sources of the funds located in the **SUBJECT PROPERTY** beyond those traceable to Victim 2. The funds were traced in part to the bitcoin address 3CeHfweJtWqZ3PhSu1HUnP9W49Ar6AAp59 (**"Address 3"** as defined in the table below). Analysis of records from the FBI's Internet Crime Complaint Center ("IC3") revealed that funds of the victim of another scam ("Victim 3") had been sent to the **SUBJECT PROPERTY** as well.

30. Victim 3, who resided in Los Angeles, California, submitted an online complaint to the FBI on August 11, 2022. According to Victim 3's complaint, Victim 3 was contacted by an individual who identified himself as "GREG SHAW" from the Border Patrol. SHAW informed Victim 3 that Victim 3 was a victim of identity theft. SHAW then transferred Victim 3 to an individual who identified himself as "LARRY DICKINSON" from the U.S. Marshals Service. DICKINSON explained a lengthy process that was necessary in order to protect Victim 3's identity. DICKINSON directed Victim 3 to withdraw all funds from Victim 3's bank account and then directed Victim 3 to deposit the funds into a cryptocurrency ATM. DICKINSON told Victim 3 that the transaction was safe because Victim 3 was going to create an account under her own name with a secret code. DICKINSON then sent Victim 3 a QR code from a phone number that DICKINSON stated was associated with the U.S. Department of the Treasury. When Victim 3 expressed skepticism to DICKINSON, DICKINSON assured Victim 3 that the transaction was

---

(**Binance Account 1**) that included 0.01 BTC of Victim 2's funds was immediately converted to USDT and transferred directly to the **SUBJECT PROPERTY**.

legitimate. DICKINSON had a local "LAPD" officer call Victim 3 to reassure her. Once Victim 3 sent the funds through the cryptocurrency ATM, DICKINSON remained on the phone with Victim 3 until the transaction was "safe." DICKINSON then told Victim 3 that he would call back within 45 minutes and make an appointment with the SSA for Victim 3 to receive a new SSN so that her identity would be protected. When Victim 3 did not receive a phone call back from DICKINSON after an hour, Victim 3 contacted the FBI and learned that she had been a victim of a scam.

31. Approximately $27,600 of funds from Victim 3 were deposited into cryptocurrency ATMs where they were converted to cryptocurrency. Most of the funds, now in the form of cryptocurrency, were traced to the **SUBJECT PROPERTY** using a commercially available proprietary software tool that analyzes transactions on cryptocurrency blockchains. This activity is shown in the following table:

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 08/11/2022 | 0.95 BTC | Victim 3 ATM deposits | 3CeHfweJtWqZ3PhSu1HUnP9W49Ar6AAp59 **("Address 3")** |
| 08/12/2022 | 0.94 BTC | **Address 3** | **Wallet A**[5] |
| 08/12/2022 | 0.94 BTC | **Wallet A** | 3PmoZTBQ5FRxRuj2z7NLvRPLGxaeetwGbD **("Address 4")** |
| 08/16/2022 | 2.00 BTC[6] | **Address 4** | bc1q8tn8wdh368dznpasr6l6fuqrpmrfyh9pzzxlj5 **("Address 5")** |
| 08/17/2022 | 2.00 BTC | **Address 5** | bc1qjpta4yl8dwmqgwmmmjuutp5s7873t35mgjnag8 **("Address 6")** |
| 08/19/2022 | 2.00 BTC | **Address 6** | bc1q92r6te849t6kckjq3kgzc6g2kx030x3maayt3g **("Address 7")** |

[5] The 0.94 BTC was sent from **Address 3** over two transactions to the two addresses 3No8aQfPHC9p2BtgMWZXooaSZSzrqBmXic and 325JgL7D3KWh9wh4xow2UqAYrpU4N8VQRq, which were both in a single Bitcoin wallet ("**Wallet A**") that contained seven addresses.

[6] The 2.00 BTC is greater than the 0.94 BTC traced from Victim 3 because this transfer also included BTC from other sources. This applies to the successive BTC transactions in the table as well.

| | | | |
|---|---|---|---|
| 07/22/2024 | 3.86 BTC | **Address 7** | bc1qwrnazpu847d662swyvugd04dqkdkpeuqmvhu7r **("Address 8")** |
| 10/17/2024 | 1.30 BTC[7] | **Address 8** | **Binance Account 1** |
| 10/17/2024 | 88,726.82 USDT | **Binance Account 1** | **SUBJECT PROPERTY** |

32. On October 27, 2024, Tether agreed to freeze the **SUBJECT PROPERTY** at the request of an FBI agent after being provided a list of transaction hashes associated with the fraud scheme. As of October 27, 2024, the **SUBJECT PROPERTY** had a balance of 180,553.26 USDT[8] tokens.

33. In my training and experience, I know that individuals involved in fraud schemes such as those described above will often move fraud proceeds into cryptocurrency form, as well as move fraud proceeds rapidly through multiple accounts, all to make it more difficult for law enforcement to track and seize the proceeds.

34. Based on the specific tracing of USDT obtained fraudulently from Victims 2 and 3 to the **SUBJECT PROPERTY**, it is reasonable to believe that the funds in the **SUBJECT PROPERTY** are proceeds of criminal activity and are involved in money laundering. Further, although the FBI was unable to trace all funds located in the **SUBJECT PROPERTY** to additional, specific victims, those funds trace back primarily to US-based cryptocurrency ATM providers like those used by Victims 2 and 3, as well as to known scam wallets reported to a commercially available proprietary software tool that analyzes transactions on cryptocurrency

[7] The 1.30 BTC deposit to **Binance Account 1** that included 0.94 BTC of Victim 3's funds was immediately converted to USDT and transferred directly to the **SUBJECT PROPERTY**.
[8] Following the freeze by Tether, additional USDT tokens were sent to the **SUBJECT PROPERTY**. The freeze by Tether applied to all outgoing transactions from the **SUBJECT PROPERTY** and did not apply to incoming transactions. At the time of the seizure, the current balance of USDT tokens in the **SUBJECT PROPERTY** was 183,011.28.

blockchains. For this reason, your Declarant believes the entire balance of the **SUBJECT PROPERTY** is comprised of funds obtained by fraud. In addition, even if the source of some funds in the **SUBJECT PROPERTY** cannot be conclusively shown, because the **SUBJECT PROPERTY** contains illicit funds, your Declarant respectfully submits that all funds in the **SUBJECT PROPERTY** are involved in money laundering.

**CONCLUSION**

35. Based on the forgoing, I submit that there is probable cause to believe the funds held in the **SUBJECT PROPERTY**, in any form, are proceeds of, or traceable to proceeds of, violations of 18 U.S.C. §1343 (Wire Fraud), and are involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering), and therefore subject to civil forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

AARON CAPITEL
Digitally signed by AARON CAPITEL
Date: 2026.07.20 11:07:17 -04'00'

Special Agent Aaron Capitel
Federal Bureau of Investigation